**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **MCKIM'S HONEYVINE LLC** | **:** | |
| | **:** | **COMPLAINT** |
| | **:** | |
| **Plaintiff,** | **:** | |
| | **:** | |
| **v.** | **:** | **JURY TRIAL DEMANDED** |
| | **:** | |
| **NORFOLK SOUTHERN** | **:** | |
| **CORPORATION, and NORFOLK** | **:** | |
| **SOUTHERN RAILWAY COMPANY,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

<u>**COMPLAINT**</u>

Plaintiff McKim's Honeyvine LLC, by and through undersigned counsel, file this Complaint against Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company and allege as follows:

<u>**STATEMENT OF THE CASE**</u>

1.     Plaintiff is a business that was located in East Palestine, Ohio at the time of the Norfolk Southern train derailment. Plaintiff brings claims against Defendants arising from the derailment of a train hauling toxic chemicals in East Palestine, Ohio, on or about February 3, 2023 ("Derailment").  The resulting fire and release of toxic chemicals into the air, soil, and water have caused, and will continue to cause, direct and substantial damages to Plaintiff.

2.     Plaintiff McKim's Honeyvine LLC ("McKim's Honeyvine") is an Ohio limited liability company with its principal place of business located  at  7 3 5 East Taggart Street,  East Palestine,  Ohio 44413.

3.     Defendant Norfolk Southern Corporation ("NSC") is a Virginia corporation with its principal place of business in Atlanta, Georgia.

4.      Defendant Norfolk Southern Railway Company ("NSRC") is a Virginia corporation with its principal place of business in Atlanta, Georgia. NSRC is a wholly owned subsidiary of NSC.

5.      NSRC operates approximately 19,300 route miles (in 22 states and the District of Columbia) and serves every major container port in the eastern United States.

6.      According to the Federal Railroad Administration ("FRA"), NSRC had the most derailments of all railroad companies in Ohio from 2019 through 2022, with 67 accidents total—22 in 2019, 18 in 2020, 15 in 2021 and 13 in 2022.

7.      According to the FRA, NSRC also had the most derailments of all railroad companies in Pennsylvania. This includes 74 total accidents (89.2% of all derailments in Pennsylvania) from 2019 to 2022—23 in 2019, 14 in 2020, 23 in 2021, and 14 in 2022.

8.      At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents. Collectively, Defendants NSC and NSRC will be identified as "Norfolk," "Norfolk Southern," or "Defendants."

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action based upon 28 U.S.C. § 1332. Plaintiff is a citizen and resident of Ohio. Defendants Norfolk Southern are both citizens of Virginia and Georgia. The amount in controversy herein exceeds the sum of $75,000, exclusive of interest and costs.

10.     Venue is appropriate in this Court in that a substantial part of the events, acts and omissions giving rise to the claims herein occurred in this district and division.

## FACTUAL ALLEGATIONS

**Norfolk's Implementation of "Precision Scheduled Railroading"**

11.     For approximately five years prior to the Derailment, Defendants had been implementing a number of operational changes that directly prioritized profits over safety through the use of a strategy known as "Precision Scheduled Railroading" ("PSR").

12.     While PSR is not defined by any specific list of required operational changes, PSR is associated with operational changes designed to increase efficiency in terms of operating costs relative to revenue. These operational changes associated with PSR include reductions in staff; longer, heavier trains; tighter schedules; and reductions in assets such as locomotives. At its core, the PSR mandates that trains should transport larger and heavier loads in less time with fewer workers performing onsite operation and safety procedures.

13.     In 2019, Norfolk laid out its three-year transformational plan to implement PSR (referred to as the "Thoroughbred Operating Plan" or "TOP21"). The TOP21 plan included centralizing operations; reducing staff; running fewer, heavier, faster trains; and optimizing Norfolk's network in order to increase efficiency.

14.     At its core, PSR was Norfolk's plan to cut jobs, cut costs, cut safety, and increase risks – all so Norfolk could increase their profits.

15.     Upon information and belief, these same or similar operating changes were in place at the time of the Derailment and subsequent explosion, particularly as several key metrics leading up to the Derailment showed a dramatic reduction in Norfolk Southern's workforce, a reduction in train engineers/operators, an increase in its trains' average speed, and a resulting sharp increase in company profits as these operational and safety cuts were enacted.

16.     Norfolk identified its "Operating Ratio" as the key metric to measure its progress. Operating Ratio was to be calculated by dividing its operating expenses by its operating revenues. In

essence, Norfolk sought to significantly increase revenues by cutting otherwise reasonable safety and operational costs. Norfolk set a goal of reducing its Operating Ratio to 60% by 2021 (it was then running at 65.4%). Norfolk also changed its executive compensation in 2019, tying approximately 80% of the compensation to PSR objectives, including Norfolk's Operating Ratio.

17.     In furtherance of these goals, Norfolk executives set a tight deadline to complete its transition, namely, full PSR implementation by 2021. This required the railroad to cut headcount by 500 railway workers in 2019 and by 3,000 by 2021.

18.     In 2019, Norfolk put out a statement regarding its PSR overhaul stating, "[w]e set company records for train speed, which improved 17% year-over-year, and terminal dwell, which was down 30%[.]"

19.     According to Association of American Railroads ("AAR") and Surface Transportation Board "(STB") data, the average operating ratio for Class I railroads decreased from 73% in 2011 to 62% in 2021; reflecting an increase in net revenue of about 58%—from almost $18 billion to more than $28 billion—over that same period.

20.     By 2022, Norfolk Southern's had cut even deeper into its workforce, employing an average of only about 19,000 railway workers compared with about 27,000 workers only 5 years earlier – a reduction of nearly 30% of its workforce.  These reductions directly and proximately resulted in reduced operational safety for Norfolk trains and increased risk to Plaintiff.

21.     Norfolk's executives earned millions of dollars in awards as Norfolk's Operating Ratio and headcount dropped each year. In 2021, when Norfolk hit a record low Operating Ratio, it helped then-CEO Squires land nearly $3.5 million in cash bonuses – almost three times what he had earned just the year before. At least four other executives received more than a million dollars each in similar incentive-based bonuses. Tellingly, in the Proxy Statement the Company filed with the SEC on March 31, 2022, Norfolk highlighted its 2021 "record performance for train length and

weight" as partial justification for why [Norfolk] executives earned a cash payout that year.

22.     NSC has also issued Railroad Special Hazmat Instructions that govern the transportation and handling of hazardous materials by NSRC employees.

23.     NSC requires each NSRC employee who inspects or transports hazardous materials by rail to have a copy of and comply with the Railroad Special Hazmat Instructions.

24.     Upon information and belief, NSC's Railroad Special Hazmat Instructions were in place at the time of the train derailment and subsequent explosion.

**The Safety Concerns of PSR**

25.     For years, safety concerns have been building in the railroad industry as a result of PSR, the growing length of trains, and the industry's increased efforts to unreasonably reduce costs and headcount.

26.     Longer trains coupled with fewer personnel to inspect, maintain, and operate each train directly and proximately decrease operation safety and increase the potential for derailments. Employees have described a once reasonable system stretched beyond its limits, with one employee expressing, "the workers are exhausted, times for car inspections have been drastically cut, and there are no regulations on the size of these trains."

27.     According to STB employment data, Norfolk reduced its workforce by 39% from 2011 through 2021, with most of that reduction occurring between 2019 and 2021.

28.     According to GAO, the largest percentage decrease was among "Maintenance of Equipment and Stores" employees, which includes mechanical staff, such as foremen, carmen, and mechanist, who are responsible for the maintenance of equipment, including railcars and locomotives. The next largest percentage decrease was among "Transportation (Other than Train and Engine) employees, which include train dispatchers, crew dispatchers, and railyard supervisors (called yardmasters).

29.     Norfolk's decision to adopt PSR likewise contributed to them cutting the use of signalmen to install, repair, and maintain signal systems, which railroads use to direct trains from one location to the next safely and on time.

30.     These same signalmen are responsible for inspecting, maintaining, and repairing wayside detectors like "hot-box" detectors, which alert operators to equipment failures while the train is in operation.

31.     In fact, under Norfolk's PSR program, Defendants have no such signalmen employed in or around the area of East Palestine, Ohio.

32.     In 2022, GAO reported that all seven Class I railroads stated they ran longer trains with the underlying goal of increasing operational efficiency. For example, according to one railroad, average train length has increased from 5,250 feet in 2011 to about 7,000 feet in 2021. According to another Class I railroad, the percentage of trains over 10,000 feet long has increased from less than 3 percent in 2017 to more than 25 percent in 2021. According to a third railroad, while the average train length has increased from about 6,300 feet in 2019 to nearly 7,000 feet in 2021, the percentage of trains over 10,000 feet has increased from 0.2 percent to about 5 percent during that timeframe.[1]

33.     As Norfolk has aggressively implemented its PSR program over the previous four years, Norfolk's Federal Railroad Administration ("FRA") train accident rate has likewise increased. In December 2022, just two months before the Derailment here, GAO reported that Norfolk had hit a 10-year high with its accident rate in 2021. Similarly, Class I freight railroads suffered two derailments for every million miles traveled in 2022.

34.     The FRA reports that between January 2022 and May 2022, Norfolk suffered from significant safety violations including undercounting, inadequately observing rules failures, and

---

[1] GAO, RAIL SAFETY: *Freight Trains Are Getting Longer, and Additional Information Is Needed to Assess Their Impact*, GAO-19-443 (Washington, D.C.: May 30, 2019).

failing to verify the performance of operational tests. FRA noted that "NS did not take immediate actions to remediate defective conditions" and that "these conditions have exposed crews to increased hazards, potential property damage, and injuries due to defective equipment knowingly left in service". Additionally, FRA identified a number of rail component defects and warned Norfolk Southern that "when critical components are not maintained, there is an increased risk of sudden failure with catastrophic potential."

35.     According to data from the FRA, there were a total of 103 derailments in January 2023, and 11 were Norfolk derailments.

36.     Critics within the industry have stated that the Operating Margin incentivizes executives to cut costs at the expense of safety.[2]

37.     Steven Ditmeyer is among those who has connected the drive to lower operating costs – and thereby improve Operating Margin – directly to longer, more dangerous trains, stating: "The longer they make [the train], the per-car cost of labor is less. And the longer trains have greater damage done, greater, larger pileups, fires and so on."

38.     After seeing how Norfolk's executive compensation rules could lead to large cash payouts by driving down the Operating Ratio by just a fraction of a percent, Jared Cassity (the safety director of SMART, the nation's largest railroad union) stated: "**You have these executives that are getting rewarded and so** the instructions keep coming down no matter what . . .. I want more and that's why you see the railroads saying that **the train length is going to continue to grow no matter what.**" (emphasis added)

**Norfolk Prioritized Profits Over Safety and Actively Lobbied to Block Reasonable Safety Precautions**

39.     As the railroad industry and Norfolk embraced PSR, Norfolk ramped up its lobbying efforts - including most notably in Columbus, Ohio - to prevent safety regulations that would

---

[2] According to Steven Ditmeyer, the former director of research and development at the FRA, "[r]ailroads are seeking to have that number be the smallest, lowest number possible." He explained, "[y]ou want to squeeze the costs and increase the revenues."

increase costs and hamper the operating margins which were so closely tied to executive compensation and bonuses.

40.     Norfolk has spent tens of millions of dollars over the years lobbying state governments, Congress, and federal agencies by trying to block potentially costly safety reforms, including by opposing whistleblower protections and speed limits for ultrahazardous flammable trains. Additionally, Norfolk has opposed an ongoing federal effort to require a minimum number of crew members on a train. In December 2022, Norfolk reportedly told the FRA that running trains with just a one-person crew is safe.

41.     In 2015, Norfolk played a key role in defeating an Obama-era safety rule that was issued following a number of oil train accidents. The rule required trains carrying oil or other hazardous liquids to be equipped with electronically controlled pneumatic ("ECP") brakes on their rail cars ("ECP Brake Rule"). While air brakes stop train cars individually, as air pressure moves sequentially from one car to the next, ECP brakes operate using an electronic signal which can stop an entire train much faster. Notwithstanding the safety benefits, Norfolk retained 47 federal lobbyists to fight against the ECP Brake Rule. Ultimately, the ECP Brake Rule was repealed in 2018.

42.     In Ohio alone, Norfolk has made over 100 contributions to Ohio state officials and candidates over the last 5 years, according to data from Ohio's secretary of state. Additionally, Norfolk has hired lobbyists to influence the course of legislation with Norfolk filing more than 200 state-required quarterly reports disclosing lobbying in the past 6 years.

43.     In Ohio, Norfolk employs the well-connected Columbus-based lobbying firm called The Success Group. Governor DeWine's former legislative director Dan McCarthy led the firm prior to joining the administration. McCarthy was later implicated in facilitating the bribery of the former Ohio House of Representatives Speaker Larry Householder, who was convicted of racketeering conspiracy for taking $60 million from Ohio utility First Energy to assist that

8

company in passing House Bill 6. McCarthy resigned from the DeWine administration in September 2021. The Success Group began representing Norfolk in 2009. Since then, Norfolk's lobbyists have repeatedly fended off legislation imposing a minimum staffing requirement of a 2-person crew or penalties for blocked railroad crossings.

**Derailment of Train 32N**

44.     On Friday February 3, 2023, Norfolk Southern Freight Train 32N ("Train 32N") was traveling from Madison County, Illinois to Conway, Pennsylvania.

45.     Upon information and belief, multiple safety issues occurred on Train 32N that evening and were either undetected or ignored by Defendants' employees.

46.     Notably, a VICE article published after the Derailment entitled '32 Nasty': Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous, "two workers … said 32N in particular was a known safety risk." [3]

47.     These two workers told VICE that "multiple red flags, including two mechanical problems, about 32N went undetected or were ignored in the hours leading up to the crash."

48.     Defendants' rail lines operate a hot bearing detector ("HBD"), that transmits an audible alarm to the train crew to slow and/or stop the train to inspect a hot axel.

49.     A wheel bearing from Train 32N's 23rd rail car recorded a temperature of 38 degrees Fahrenheit above ambient temperature at mile post 79.9.

50.     The next HBD Train 32N passed at mile post 69.01 recorded that the same bearing's temperature had reached 103 degrees Fahrenheit above ambient temperature.

51.     As Train 32N passed the third HBD at mile post 49.81, the wheel bearing on rail car 23 reached a temperature of 253 degrees Fahrenheit above ambient temperature. According to

---

[3] Vice, *'32 Nasty:' Rail Workers Say They Knew the Train That Derailed in East Palestine Was Dangerous*, available at https://www.vice.com/en/article/88qze4/32-nasty-rail-workers-say-theyknew-the-train-that-derailed-in-east- palestine-was-dangerous (Feb. 15, 2023) (last visited Oct 6, 2023).

Defendants' own policies, any reading above 170 degrees Fahrenheit requires the train crew to stop the train. Defendants considers any reading over 200 degrees "critical."

52.     Video footage from around this same time caught one of the rail cars of Train 32N sparking in the wheel bearing and axle area. A former Norfolk train engineer who viewed the video explained: "That was a tell-tell sign 'cause there's so much pressure, so much on that bearing, it won't last long sparking that hot that much.'"

53.     Before the full train derailment took place, a mechanical defect alarm alerted the crew members of the malfunctioning railcar axle. In addition, Train 32N had broken down at least once prior to the wheel bearing overheating on the same evening on this same route.

54.     An emergency brake was also applied after the workers on Train 32N finally became aware of these malfunctions but before the full Derailment occurred.

55.     Around 8:55 p.m. on February 3, 2023, the overheated wheel bearing caused rail car 23's axel to fail, derailing the car and causing approximately 40 of the other train cars to derail with it in or near East Palestine, Ohio ("Derailment").

56.     Approximately 11 of the derailed rail cars were carrying abnormally dangerous and/or ultrahazardous chemicals that are known to be carcinogens by the Environmental Protection Agency ("EPA") including, but not limited to, polyvinyl, polyethylene, vinyl chloride, ethylene glycol monobutyl ether, ethylhexyl acrylate, isobutylene, benzene, and butyl acrylates ("Toxic Chemicals").

57.     According to employees familiar with this matter, there had been widespread concerns that night among those working on Train 32N regarding the train's excessive length and weight – approximately 151 cars, 9,300 feet long, and 18,000 tons. Additionally, Train 32N was backloaded with 40% of its weight, the heaviest tanker cars, at the rear.

58.     Through information and belief, Norfolk Southern was aware of the increased risks of a dangerous event occurring with Train 32N prior to its derailment, but intentionally acted – and instructed others to act – in a manner that violated its own internal safety or operating procedures.

59.     Through information and belief, Norfolk Southern was aware – and had advance notice – that the personnel working on Train N32 were not adequately prepared to mitigate or prevent the derailment on February 3, 2023, or to comply with the companies' own internal or outwardly stated safety protocols.

60.     All of these factors contributed to both the initial breakdown and the Derailment.

61.     The immediate result of the Derailment was that millions of pounds of Toxic Chemicals were spilled into the air, soil, and water – including directly onto Plaintiff's property.

**Norfolk's Response Compounded the Derailment's Harm**

62.     Norfolk failed to report the Derailment to federal authorities until two hours after the Derailment at approximately 10:53 p.m., in violation of applicable federal regulations. *See* C.F.R. § 225.9(a)(2)(iv).

63.     Following the Derailment on the evening of Friday, February 3, 2023, the fire created by the burning railcars and their contents was large enough to be detected by the Pittsburgh, Pennsylvania weather radar approximately 50 miles away for several hours. The fire's intensity appeared to peak at approximately 10:40 PM, and the resulting smoke plume in the immediate aftermath traveled at least as far as Beaver Falls, Pennsylvania.

64.     Defendants failed to promptly inform firefighters and other first responders of the hazardous contents of many rail cars on Train 32N. This lack of information impeded first responders' response, preventing them from extinguishing the fire and allowing it to rapidly spread.

65.     The fire continued to burn with increasing intensity for the next few days on Saturday (February 4, 2023), Sunday (February 5, 2023), and/or Monday (February 6, 2023).

66.     On or about Saturday February 4, 2023, government officials issued an evacuation order for residents within a one-mile by two-mile radius of the Derailment Site ("Danger Zone") affecting thousands of residents.

67.     On or about Sunday February 6, 2023, residents of Mahoning County and other surrounding communities were advised to stay indoors and shelter in place.

68.     The railcars containing the Toxic Chemicals were equipped with emergency valves to vent the contents and relieve pressure, but multiple of these valves malfunctioned as a result of poor maintenance by the Defendants.

69.     On Sunday and/or Monday (February 5-6, 2023), there was an increase in temperature and pressure within one of the railcars containing vinyl chloride due to malfunctioning safety valves. This increased the potential of catastrophic tanker failure and an explosion.

**Norfolk's Controlled Burn Caused Widespread Contamination**

70.     Upon information and belief, NSC and NSRC reported to federal, state, and local officials that the only way to avoid a catastrophic tanker failure and explosion was to conduct a "controlled release" of the vinyl chloride in the compromised tanker.

71.     Before conducting this "controlled burn," and well after the train had derailed, Defendants' response team made the decision to disregarded materially relevant statements from third parties about the contents of the railcars and their current state in undertaking the "controlled" vent and burn of the vinyl chloride.   This "controlled burn" decision, and all subsequent recommendations made and/or instructions given by Defendants regarding the derailed Train N32, would end up independently being direct and proximate causes of Plaintiff's damages.

72.     On or about Monday February 6, 2023, at approximately 4:30 p.m., Defendants intentionally blew holes in each of the derailed cars containing vinyl chloride to drain the chemical

into a trench where flares would then ignite and burn the vinyl chloride away ("Controlled Release").

73.     Following the Controlled Release, a large plume of thick black smoke formed a mushroom-like cloud, which dispersed the Toxic Chemicals into the environment ("Controlled Burn"), causing further contamination and exposure.

74.     Defendants failed to investigate possible alternatives to the Controlled Burn, instead choosing to pursue the course that would allow the railroad to re-open as quickly as possible, regardless of the consequences to Plaintiff and the East Palestine community. The failure to timely convey information to authorities as described above also prevented the evaluation and exploration of safer alternatives to the Controlled Burn.

75.     During the resulting multi-day fire, at least three railcars containing diethylene glycol broke open and discharged into the surrounding environment.



76.     The smoke from the Controlled Release and ongoing railcar fires was trapped from rising higher into the atmosphere due to an inversion layer at approximately 3,000 feet, resulting in

the toxic plume of thick, billowing smoke that spread out horizontally through East Palestine and neighboring towns. This effect is shown clearly in the picture above taken during the Controlled Release and Burn.

77.     The expected heat generated by this burn would have exceeded 2,000 degrees.  The residues, gases, and vapors produced by the fire at this temperature are Products of Incomplete Combustion (PIC) that would have included particle matter (PM), polycyclic aromatic hydrocarbons (PAHs), carbon dioxide, carbon monoxide, heavy metals, dioxins, and other complex chemical compounds related to the constituents which were burned out of the derailed Train N32 cars.

78.     The extreme heat from Defendants' "controlled burn" then drove PICs into building infrastructures as heat expanded or opened the surface. Cooling then locked in the PICs. This heat was so extreme that it would cause increased particle vibration and force acceleration into and through the walls of proximate structures immediate adjacent to the derailment. Often heat damage and PIC deposits of this type do not manifest themselves until the structure is entirely removed.

79.     In Youngstown, Ohio – more than 20 miles from the Derailment Site – an EPA airborne particulate pollution monitor detected a greater than five-fold increase in the concentration of fine particulate matter during the time of the Controlled Burn.

80.     Following the completion of the burn, previously evacuated residents and businesses were given the "all clear" for return by Thursday, February 9, 2023.

81.     On February 10, 2023, the EPA stated that the Derailment and subsequent fire and Controlled Burn released, and continues to release, including but not limited to, vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ethers to the air, surface soil, and surface waters.

**The Toxic Chemicals Released are Extremely Hazardous to Human Health**

82. Vinyl chloride is classified by the Department of Health and Human Services as known to be a carcinogen. The EPA has classified it as a Group A human carcinogenic – the most dangerous to human health – by the inhalation, oral, and dermal routes of exposure. Short-term exposure to vinyl chloride can cause, including but not limited to, dizziness, nausea, headaches, difficulty breathing, lung irritation, chest pains, coughing, eye irritation, loss of consciousness. Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia. When vinyl chloride burns, it decomposes into hydrogen chloride and phosgene. "Phosgene is highly poisonous and was used extensively during World War I as a choking agent, while hydrogen chloride is irritating and corrosive to any tissue with which it comes into contact." According to the National Transportation Safety Board ("NTSB"):

> Vinyl chloride is a colorless gas with a mild, sweet odor that is used to make polyvinyl chloride ("PVC"). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration ("OSHA") regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph C of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence. The odor threshold is too high to provide adequate warning for hazardous conditions.

83. Butyl acrylate is a clear colorless liquid with a sharp characteristic odor. It is used to manufacture paints, sealants, and adhesives. Exposure can cause irritation of the eyes, skin, and upper respiratory system.

84.     Ethylhexyl acrylate is a colorless liquid used to manufacture paints and plastics. Exposure by inhalation or absorption through the skin can irritate and burn the skin, eyes, nose, throat, and lungs and can cause dizziness, nausea, drowsiness, and headaches.

85.     Ethylene glycol monobutyl ether is a colorless, toxic, flammable liquid used to manufacture paints and varnishes. Its vapors are heavier than air and will spread along the ground and collect in low or confined areas such as sewers and basements. Exposure by inhalation or absorption through the skin can irritate the eyes and nose and can cause dizziness, nausea, vomiting, and headaches.

86.     Isobutylene is a colorless, highly flammable gas. Exposure by inhalation or absorption through the skin can cause irritation, dizziness, drowsiness, and unconsciousness.

87.     Benzene is a colorless or yellow liquid that is highly flammable, dissolves slightly in water, has a sweet odor, and evaporates in the air very quickly. The EPA has classified it as a known carcinogen. Short-term exposure to high levels of benzene can cause drowsiness, dizziness, unconsciousness, and death. Long-term exposure increases the risk of developing lymphatic and hematopoietic cancers, acute myelogenous leukemia, as well as chronic lymphocytic leukemia. OSHA has set limits of 1 part benzene per million (1 ppm) part of workspace air for 8-hour shifts and 40-hour work weeks.

88.     In addition to the hazardous chemicals carried on Train 32N, the derailment and resulting burning of the cars and their carried chemicals resulted in the creation and/or release of additional constituents and hazardous substances which directly impacted Plaintiff's property.

89.     Aldehydes, including but not limited to Formaldehyde, were created and/or released into the environment – and onto Plaintiff's property – by the Train 32N derailment and the burning of the derailed tanker chemicals. Formaldehyde is a compound with the formula $CH_2O$ and structure H−CHO. The pure compound is a pungent, colorless gas that polymerizes spontaneously

into paraformaldehyde. The International Agency for Research on Cancer (IARC) classifies formaldehyde as a human carcinogen. In 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen in its 12th Report on Carcinogens.

90.     Polyaromatic hydrocarbons (PAHs), including benzo(a)pyrene, were created and/or released into the environment – and onto Plaintiff's property – by the Train 32N derailment and the burning of the derailed tanker chemicals. PAHs generally have a high degree of acute toxicity in humans and have been associated with increased incidences of lung, skin, and bladder cancers from occupational exposures. It has been scientifically established that PAHs, after metabolic activation in vivo, are capable of inducing mutations in oncogenes and, by inducing multiple mutations, may result in tumors.

91.     Phthalates, including Bis(2-ethylhexyl)phthalates (DEHP), were created and/or released into the environment – and onto Plaintiff's property – by the Train 32N derailment and the burning of the derailed tanker chemicals. Phthalates are a series of chemical substances, which are mainly used as plasticizers and can potentially disrupt the endocrine system. Animal studies have demonstrated that DEHP exposure resulted in liver cancer in rats and mice. The Department of Health and Human Services (DHHS) has determined that DEHP may reasonably be anticipated to be a human carcinogen. EPA has determined that DEHP is a probable human carcinogen.

92.     Dioxins were created and/or released into the environment – and onto Plaintiff's property – by the Train 32N derailment and the burning of the vinyl chloride from derailed cars. Dioxins are "white crystalline needles" that are invisible to the eyes and generally disperse and attach to soil and dust particles. Dioxins are highly toxic and carcinogenic, and they can also cause reproductive and developmental problems, damage to the immune system, and can disrupt normal hormonal function. As put by a Carnegie Mellon University Chemistry Professor: "[v]inyl chloride

is bad, dioxins are worse" as dioxins are persistent environmental pollutants that may last in the ground for 60-80 years.

93.     Petroleum or gasoline constituents (including ethylbenzene, toluene, and xylenes) and chlorinated solvents (tetrachloroethylene) were created and/or released into the environment – and onto Plaintiff's property – by the Train 32N derailment and the burning of chemicals from the derailed tankers. Ethylbenzene may cause cancer in humans. It causes tumors in the kidneys, lungs, and liver of animals as well as severe inner ear damage. Exposure to toluene can cause eye and nose irritation, tiredness, confusion, euphoria, dizziness, headache, dilated pupils, tears, anxiety, muscle fatigue, insomnia, nerve damage, inflammation of the skin, and liver and kidney damage. Exposure to xylene can irritate the eyes, nose, skin, and throat. Xylene can also cause headaches, dizziness, confusion, loss of muscle coordination, and in high doses, death. The Center for Disease Control (CDC) states individuals may be harmed from exposure to toluene. Tetrachloroethylene is a colorless liquid with a mild, chloroform-like odor. Exposure to tetrachloroethylene may cause irritation of the eyes, skin, nose, throat, and respiratory system. It may also cause liver damage and is a potential occupational carcinogen.

**Plaintiff Has Suffered Catastrophic Losses from the Derailment and Burn**

94.     Plaintiff McKim's Honeyvine is owned and operated by Michael and Ashley McKim (collectively "the McKim's).

95.     The McKim's started making and selling wine out of their home about eight (8) years ago. As their customer base and sales grew, the McKim's decided to open a facility in the heart of East Palestine, Ohio to be a premier event space, retail hub, and tasting venue.

96.     In or around March of 2021, the McKim's purchased the property located at 735 East Taggart Street, East Palestine, Ohio 44413 – less than 0.2 miles from where the Derailment would ultimately occur – and immediately began renting out the facility as an event venue.

97.     Renovations of the facility took over a year to fully support its retail operations and store. While the renovations were being completed, the McKim's continued selling wine out of their home and experienced a steady growth of customers and sales. The grand opening of its new facility was planned for March 2023, but the Derailment occurred just weeks before.

98.     Plaintiff attempted to keep its businesses open by hosting events and selling wine however it could, but it immediately suffered numerous cancellations due to the fear over whether the property and existing wine stock was contaminated by the Derailment. Defendants also had cleanup crews and their heavy equipment working nearby, which produced smoke, debris, and odors that traveled onto Plaintiff's property. These issues caused by the Derailment forced Plaintiff to eventually halt its good-faith attempt to stay open, and nearly all normal business activities at 735 East Taggart Street have now ceased.

99.     Following the Derailment, exterior soil and internal surface testing have been conducted confirming the presence of PAHs, phthalates, dioxins, and VOCs. Additionally, work conducted by Defendants and its contractors has routinely flooded parts of the property, creating another impediment to Plaintiff's ability to gainfully use its property as intended.

100.    As a direct and proximate result of the Derailment, Plaintiff has lost nearly the entirety of its ongoing revenue, has suffered a loss of past and/or future customer confidence in its ability to operate or fulfill orders, and will likely never again be able to operate its business in its current location or regain its prior growth trajectory. This lost income, lost property value, lost investment, and lost business opportunity and income is directly and proximately due to Defendants' conduct and is permanent and continuing in nature.

101.    As a direct and proximate result of the Derailment, and Defendants' actions prior to and after the Derailment, the broader community, and specifically each named business owner Plaintiff, has been subjected to intense emotional distress as their businesses, life's work, and

livelihoods were irreparably harmed. This emotional distress would have been foreseeable to Defendants, and to any reasonable business which operated in the same manner as Defendants, and it is permanent and continuing in nature.

## COUNT I: NEGLIGENCE

102.    Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

103.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a reasonable manner which would not cause Plaintiff harm while still complying with all federal statutory requirements. Defendants failed this duty.

104.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a manner which was consistent with their own internal safety guidelines while still complying with all federal statutory requirements. Defendants failed this duty.

105.    Defendants had a duty of care to operate, maintain, inspect, and repair their railway and Train 32N in a manner which was consistent with their own externally stated safety practices while still complying with all federal statutory requirements. Defendants failed this duty.

106.    Defendants knew or should have known of the dangers of the failure to operate, maintain, inspect, and repair their railway and Train 32N in a reasonable manner and that failure could reasonably lead to a breach of this duty resulting in the damages incurred by the Plaintiff.

107.    Defendants are under a heightened duty to operate, maintain, inspect, and repair their railcars known to be used for transporting toxic and hazardous chemicals. Defendants failed this duty.

108.    Defendants had control over this equipment and property at all times herein.

109.    Defendants breached their duty of care to Plaintiff by their failure to:

a) Operate, maintain, inspect, and/or repair the railway and railcars in such a way as to ensure their safe and proper operation during the ordinary course of business, particularly while transporting toxic and hazardous materials;

b) Ensure proper procedures, alarms, and/or other systems for timely monitoring malfunctions of the railway and railcars to prevent or mitigate derailments, particularly while transporting toxic and hazardous materials.

c) Ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars, particularly while transporting toxic and hazardous materials.

d) Ensure a proper mechanism for stopping or mitigating malfunctioning railcars in a timely manner without derailment, particularly while transporting toxic and hazardous materials.

e) Avoid and/or prevent overloading the train with excessive railcars or materials;

f) Load the railcars consistent with the accepted practice;

g) Load the railcars to avoid placements of the heavier cars in the rear, or "backloading", with particular consideration to whether the planned route is downhill;

h) Ensure to have an adequate number of staff for purposes of planning, coordinating, overseeing, and monitoring the transportation of toxic and hazardous materials by railcar;

i) Hire, train, manage, and supervise their agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

j) Properly and adequately determine the qualifications, skill, and capabilities of their agents, servants, employees, including but not limited to, the train engineer and dispatcher concerning the operation of Train 32N at the time of the Derailment;

k) Ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained, particularly while transporting toxic and hazardous materials;

l) Properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the safety and emergency procedures in the event of a possible derailment;

m) Route railcars transporting toxic and hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

n)      Adequately warn those in danger of exposure to toxic and hazardous materials;

o)      Institute proper procedures and training for response to the mechanical malfunction of a railcar;

p)      Institute proper procedures and alarms to identify and address fire on a railcar that contains toxic and hazardous materials;

q)      Institute proper procedures and training for response to a derailment of railcars, particularly while transporting toxic and hazardous materials;

r)      Institute proper procedures to avoid exposing toxic and hazardous materials to the environment;

s)      Implement or have an emergency response plan to contain the spread of toxic and hazardous materials into the surrounding air, water, property, and persons in the event of a derailment;

t)      Institute proper procedures for timely notifying the appropriate governmental authorities in the event of a derailment;

u)      Timely implement an emergency-response plan in the event of a derailment;

v)      Transport and handle toxic and hazardous materials so as to not cause harm to Plaintiff, as Plaintiff was foreseeable victims located within the Danger Zone of Defendants conduct;

w)      Properly dispose of or otherwise eliminate the toxic and hazardous materials from the derailment site, including but not limited to the use of techniques that further exposed Plaintiff to these said toxic and hazardous chemicals;

x)      Evacuate an appropriate geographical radius to avoid exposing individuals to toxic and hazardous materials and causing further injuries and/or damages;

y)      Accurately make known the risk of catastrophic injury and illness from exposure to these toxic and hazardous materials to individuals at risk of exposure, including those outside the evacuation zone;

z)      Reasonably pack, transport, maintain, dispose of, or otherwise handle these toxic and hazardous materials; and

aa)     Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

110.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting toxic and hazardous materials by railcar.

111.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of toxic and hazardous materials.

112.    Defendants owed and breached a duty of reasonable care to adequately address the spilled toxic and hazardous materials after the Derailment had taken place.

113.    Defendants prioritized the immediate resumption of its train operations over, and to the detriment of, taking the immediate and necessary steps to address the environmental catastrophe it unleased on Plaintiff.

114.    The damages sustained by Plaintiff were caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the dangers associated with its operations.

115.    As a direct and proximate result of Defendants' discharge, disposal, distribution, and release of toxic and hazardous materials throughout the area in which the Plaintiff operates and own property, Plaintiff presently suffers, and will continue to suffer, property damage, out of pocket expenses, loss of the quiet use and enjoyment of property, diminution of property value, loss of business income, loss of business goodwill, and inconvenience and emotional distress.

116.    Defendants' conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

## COUNT II: STRICT LIABILITY

117.    Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

118.    Defendants are strictly liable for the injuries and damages suffered by Plaintiff pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

119.    At all times relevant to this action, Defendants were the owner and operator of Train 32N.

120.    At all times relevant to this action, Defendants had supervision, custody, and control of Train 32N.

121.    At all times relevant to this action, Defendants owed and breached a duty of reasonable care to adequately address the spilled toxic and hazardous materials after the Derailment had taken place.

122.    At all times relevant to this action, Defendants were under a continuing duty to protect the Plaintiff from the toxic and hazardous materials.

123.    The transportation of these toxic and hazardous materials, including but not limited to vinyl chloride, is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

124.    Defendants engaged in an abnormally dangerous and/or ultra-hazardous activity for which common law strict liability applied for transporting hazardous substances which Defendants knew to be dangerous and failing to take proper precautions.

125.    Had Defendants not engaged in the abnormally dangerous and/or ultra-hazardous activity, Plaintiff would not have had its property contaminated or exposed to dangerous level of these toxic and hazardous materials, and it would not endured the other damages set forth herein.

126.    The harm to Plaintiff was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting toxic and hazardous materials in close proximity to residential, commercial, and agricultural areas.

127. Defendants' operations and toxic discharges were, and will, remain a substantial factor in causing harm to Plaintiff.

128. As a direct and proximate result of Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultra-hazardous activity, Plaintiff presently suffers, and will continue to suffer, property damage, out of pocket expenses, loss of the quiet use and enjoyment of property, diminution of property value, loss of business income, loss of business goodwill, and inconvenience and emotional distress.

129. Defendants are strictly liable, jointly and severally, without regard to fault, for all damages to Plaintiff, which were a direct and proximate result of the Derailment and release of toxic and hazardous materials that harmed Plaintiff as described herein.

130. Defendants' conduct as alleged herein shows that it acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant imposing punitive damages.

## COUNT III: PRIVATE NUISANCE

131. Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

132. Defendants have created a condition that is harmful to the health of anyone utilizing Plaintiff's property and thus interferes with the use and enjoyment of that property, caused displacement and business interruption, and caused Plaintiff to suffer the injuries and inconvenience described herein.

133. Plaintiff has suffered, and will continue to suffer from, injuries that are different from those experienced by the public generally, including the contamination of its property and interference with its business and the use and enjoyment of its property.

134.     The seriousness of the harm associated with Defendants' discharge of toxic and hazardous materials outweighs the public benefit of Defendants' conduct.

135.     Defendants knew or should have known that the toxic and hazardous materials it was transporting were harmful to individuals and real property, and that it was substantially certain that improper transportation, handling, and disposal of such materials would cause injury to Plaintiff and its property.

136.     Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiff and the wider community.

137.     Defendants' contamination of Plaintiff's property with toxic and hazardous substances has unreasonably and substantially interfered with its rights to use and enjoy its property.

138.     Defendants' contamination of Plaintiff's property with toxic and hazardous substances has caused and will continue causing them to, among other things, refrain from occupying or using its real property, being able to sell finished products that were contaminated, and allowing employees to safely occupy and use its facility. This has, in turn, caused significant loss of income, out of pocket expenses, diminution in property value, and inconvenience.

139.     Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiff.

140.     Plaintiff, unlike the public generally, has suffered specific injuries as a result of Defendants' tortious conduct including the contamination of its property and interruption of virtually all of its ongoing business activity.

141.    Defendants' improper transportation and handling of toxic and hazardous materials, both before and after the Derailment itself, and the contamination of Plaintiff's property resulting therefrom, constitutes a private nuisance.

142.    Defendants' improper transportation and handling of toxic and hazardous materials has directly and proximately caused Plaintiff to presently suffer, and continue to suffer in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, and inconvenience.

143.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

### COUNT IV: PUBLIC NUISANCE

144.    Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

145.    Defendants' improper transportation and handling of toxic and hazardous materials has created conditions that are harmful to the health of anyone utilizing Plaintiff's property and thus interferes with the use and enjoyment of that property, caused displacement and business interruption, and caused Plaintiff to suffer the injuries and inconvenience described herein.

146.    As a result of Defendants' actions and/or inactions, Plaintiff has suffered a permanent loss of use and enjoyment of its property.

147.    Defendants knew or should have known that the toxic and hazardous materials being transported were hazardous and harmful to real property and individuals, and it was substantially certain that improper transportation and handling of these materials were hazardous and harmful to property and people living in surrounding communities.

148.     Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiff and the wider community.

149.     Plaintiff has a common right to enjoy its real property free from dangerous contamination, to have clean air in and around its business, have access to clean running water without dangerous levels of toxic chemicals, and to operate its business without unreasonable exposure to toxic chemicals.

150.     Defendants' improper transportation and handling of toxic and hazardous materials substantially and unreasonably infringed upon these public rights.

151.     As a direct and/or proximate result of Defendants' improper transportation and handling of toxic and hazardous chemicals, Plaintiff's and the general public's common right to breathe clean air and have access to clean water without dangerous levels of toxic chemicals was severely diminished, if not entirely eliminated.

152.     As a direct and/or proximate result of Defendants' mishandling of toxic and hazardous materials, both before and after the Derailment itself, Defendants invaded and contaminated the areas surrounding Plaintiff's business, thus exposing all employees and other users of Plaintiff's property to toxic chemicals and carcinogens.

153.     Defendants' release of these toxic and hazardous materials also affects and will continue to affect the public at large, causing massive environmental damage to the surrounding area.

154.     Defendants' conduct is a substantial factor in creating a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, and inconvenience.

155.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT V: TRESPASS

156.     Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

157.     Defendants, though its tortious conduct alleged herein, caused and/or allowed dangerous chemicals to enter and contaminate Plaintiff's property.

158.     Defendants knew or should have that the chemicals being transported were hazardous and harmful to real property, animals, and individuals, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these toxic and hazardous materials would cause injury to Plaintiff and its property.

159.     Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to exacerbate the damages to Plaintiff and the wider community.

160.     Defendants intentionally, knowingly, and/or negligently discharged and released highly toxic chemicals onto the property of Plaintiff.

161.     Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials to enter and contaminate Plaintiff's property. Through its actions in intentionally causing others to spread their waste, they intentionally, knowingly, and/or negligently caused hazardous materials to enter Plaintiff's land and water.

162.     Defendants intentionally, knowingly, negligently, carelessly, and/or recklessly caused a trespass in the following manners:

a) by discharging through the Derailment and resulting fires pollutants, particulates, oily residue, and chemicals to release into the air, water, and soils; and

b) by allowing or causing such chemicals to discharge, seep, or migrate underground in such a manner that it was reasonably foreseeable that the toxic material would, in due course, invade Plaintiff's real property and cause physical injury to that property.

163. At all times, Defendants' conduct displayed indifference to and disregard for Plaintiff's right to enjoy the safe use of its safe property and environment.

164. Defendants' conduct invaded the real property of Plaintiff and interfered with its possessory interests of that property.

165. The discharge of toxic and hazardous materials onto the real property of Plaintiff caused physical damage to its property by casting over its property a plume of offensive emissions, pollutants, depositing chemical residue on its business, causing damage to the buildings and landscaping, and invading its real property with a nauseating smell over a continuous and sustained period of time.

166. The discharge of toxic and hazardous materials caused Defendants to enter, invade, and intrude on the real property of Plaintiff without its privilege, permission, consent, authorization, invitation, or justification.

167. Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiff's real and personal property with toxic and hazardous materials has interfered with its rights to use and enjoy its property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiff's rights in the use and enjoyment of its property as well as economic and property damages as alleged herein.

168. Defendants' trespass has also interfered with, and continues to interfere with, Plaintiff's ability to use and enjoy its property, to avail itself of the property's value as an asset

and/or source of collateral for financing, and to use its property to operate its business or in any other manner that Plaintiff so choose.

169.    As a direct and/or proximate result of Defendants' intentional, knowing, and negligent discharge of highly toxic and hazardous chemicals into Plaintiff's property, Plaintiff is entitled to damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, the cost to repair the damage and restore the property to its pre-trespass condition, the costs of recovering possession of the property, business losses, and the value of its lost use of the property as a result of all trespass and for Defendants' ongoing trespass.

170.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT VI: WILLFUL AND WANTON CONDUCT

171.    Plaintiff restates, realleges, and incorporates by reference the preceding paragraphs as if fully set forth herein.

172.    Defendants owed Plaintiff a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff.

173.    Upon information and belief, Defendants were aware that they were transporting materials that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful to human beings, animals, and the environment.

174.    Upon information and belief, Defendants were aware that transporting, releasing, and igniting substances that were highly toxic, carcinogenic, mutagenic, and/or otherwise harmful

to individuals, animals, and the environment could result in unreasonably dangerous emission of toxic and hazardous materials into the surrounding communities.

175.    Defendants knew or should have known that at least one railcar was malfunctioning and/or on fire for at least 20 miles before the Derailment.

176.    Upon information and belief, Defendants violated 49 CFR § 215.115(a) for at least 20 miles by allowing a defective wheel bearing to remain in service before the Derailment.

177.    Defendants knew or should have known that their post Derailment mitigation efforts would inadequately address the spilled toxic and hazardous materials and serve to unreasonably exacerbate the damages to Plaintiff and the wider community.

178.    Despite this knowledge, and contrary to federal and standard industry practices and procedures, Defendants breached their duties as described in Count I above.

179.    Defendants' failures to exercise any care toward Plaintiff as described in Count I above and other respects constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard for the Plaintiff and property and to the health, safety, and well-being of anyone using Plaintiff's property.

180.    The failures to exercise any care toward Plaintiff occurred under circumstances for which the probability of harm was great and the probability of harm was known to Defendants.

181.    Through their unreasonable and dangerous actions and omissions described above, Defendants intentionally deviated from a clear duty or definite rule of conduct, acted with a deliberate purpose not to discharge a duty necessary to safety, or purposely performed wrongful acts with knowledge and appreciation of the likelihood of resulting injury.

182.    As a direct and/or proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of toxic and hazardous materials near Plaintiff's property, Plaintiff presently suffers, and will continue suffering in the future, real

property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, and inconvenience.

183.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's rights so as to warrant the imposition of punitive damages.

## COUNT VII: NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

184.    Plaintiffs restate, reallege, and incorporate by reference the preceding paragraphs as if fully set forth herein.

185.    Defendants' acts and/or omissions, including continuing to pollute the environment and subsequently exposing each Plaintiff, other exposed individuals, and the general public to dangerous and harmful chemicals, and remediation or clean-up of the same, which directly affected their business interests, has caused specific harm and damages to named Plaintiffs.

186.    At all relevant times, it was foreseeable, and Defendants were certain and/or substantially certain, that its acts and/or omissions would cause emotional distress to the business owner Plaintiffs, other exposed individuals, and the general public.

187.    Defendants' acts and/or omissions were both negligent and irresponsible as well as extreme, outrageous, intolerable and/or offended the generally accepted standards of decency and morality.

188.    Defendants' long-term, repeated, extreme, irresponsible, and/or negligent actions and/or omissions are strong evidence that each Plaintiff business owner's severe emotional distress is and was justified.

189.    Defendants acted in an extreme, outrageous and intolerable manner which offended the generally accepted standards of decency and morality for all the reasons contained within Count VI (Willful and Wanton Conduct) of this complaint.

190.    As a direct and proximate result of the Defendants' acts and/or omissions, and concealment and/or affirmative misrepresentations, each Plaintiff suffered economic and other damage and injury as alleged herein for which Defendants are therefore liable.

191.    As a direct and proximate result of the foregoing acts and/or omissions, each business owner Plaintiff suffered from and/or will suffer from emotional distress with related direct and proximate damages.

192.    Defendants' conduct as alleged herein shows that while Defendants acted with irresponsible negligence at times, they also acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

Dated: January 31, 2025                              Respectfully submitted,

_/s/ Jon C. Conlin_____
Jon C. Conlin (AL Bar# ASB-7024-J66C)
F. Jerome Tapley (AL Bar# 0583-A56T)
R. Andrew Jones (AL Bar# 0096-I11R)
Hunter M. Phares (AL Bar# 5406-G38V)
**CORY WATSON, P.C.**
2131 Magnolia Ave South
Birmingham, AL 35205
Phone: (205) 328-2200
Fax: (205) 324-7896
jconlin@corywatson.com
jtapley@corywatson.com
ajones@corywatson.com
hphares@corywatson.com

**_Attorneys for Plaintiff_**